Case number 23-11299, Penny Phelps v. Sheriff Rick Ramsay. Good morning, Your Honors. I'm A.P. Secretary Kevin Kelley and I'm here to talk to you about the Deupon-Penny Phelps. The facts of this case may sound like a movie or a Netflix documentary, but they are real. Project Mayhem was and is real, and I think it's a bit funny that just recently the newly arrested Defendant Tucker started selling t-shirts that say the Project Mayhem defense, and on the website he describes it as his nickname, quote, for the, quote, unorthodox defense strategy he and Warren, which is Warren Jani, another defendant, developed while he was still in jail, end quote. The intentional acts taken, the false accusations on social media and in print, the barrage of any complaint that they could raise, the outright pleas for Ms. Phelps' termination, those were all real, and the effect on Ms. Phelps was real. I'd like to focus on two sort of areas of the allegations. First, the defamation claims against individual defendants, and basically, you know, the comments where I think there's a strong case here is that they're, Mr. Tucker, Ms. Jani, Ms. Higgins are claiming that Ms. Phelps set him up for murder, that they framed him for murder, or she framed him for murder, that she engaged or instructed a subordinate officer to engage in illegal traffic stops. These statements are made up. If someone fabricates a statement, it's made with malice, and can a reasonable juror think that someone who had a recording and claims the exact opposite of what's on the recording is true, was making it up? Certainly, a juror could, and that's a question that the jury should decide, not the district court judge, and I think one of the premises of the district court judge's opinion is that the plaintiff didn't allege defamation per se, but if you review the complaint carefully, there are allegations that the statements affected Ms. Phelps in her, injured her in her profession, business and profession, which is the standard for defamation per se, and when you have defamation per se, malice is presumed. So you have allegations that Ms. Phelps is engaging in criminal behavior, you have fabricated statements that are directly contradicted by the evidence possessed by the publishers of the statements, and you have allegations of defamation per se. That is a factual question that should be presented to the jury, whether these statements were made and whether they were defamatory. It's not a basis to dismiss the claims. That's the same thing with the tortious interference case, or claim. That was dismissed on the motion to dismiss, and the premise, or the basis upon which the district court did that was saying, hey, well, some of the basis that you're alleging the tortious interference was where complaints made to the Internal Affairs Department, but that's not all we were alleging. There's social media posts, there's meetings, there's threats of lawsuits, there's letters sent outside of this process, and I think to truly appreciate that issue, we have to look at the interplay between Meza and Gray, and the Gray case, which is an intermediate appellate position from Florida, says that statements made through the IA process are privileged. Okay, well, Meza says statements made not in compliance in that process is not privileged. So regardless, whether the court, you know, citing that proposition of law might be accurate that, hey, certain complaints can be privileged, that privilege doesn't apply to the vast majority of what we're complaining about in this case. There is a letter sent to the judge, or to the judge and to the jail, complaining about multiple people's misconduct. Ms. Phelps is the only one investigated that's not submitted through the formal process. You have Ms. Higgins testifying under oath that she never made a complaint pursuant to that process, even though she's listed as the complainant on multiple investigations. How do you deal with that? If she never made a complaint pursuant to the process, how is any of her behavior privileged under that? It's not. And that's why the district court erred, because there was allegations in the complaint sufficient that it warranted a discovery. And once we have discovery, we see that there are certainly questions here. Did they defame Ms. Phelps? Yes. Did they have an intent to discredit her, to have her lose her job? Yes. They openly admitted that's what Project Mayhem is about. I mean, it's just absurd. It's crazy that somebody created a conspiracy to harm someone, blatantly talked about it and gave it a nickname. And then there's still, there's a question about whether there's evidence of whether they attempted to interfere with her employment. Ms. Higgins posted on Facebook, why do these individuals still have jobs? And how much closer do you get to say, Sheriff, please fire them? Because she came pretty close to saying that on the radio. How is that not a tortious interference? If they are engaging in it, and while they're engaging it, they're engaging in defamation, they are spreading lies about the plaintiff? You don't dispute that your client is a public figure and they would have to show malice for the defamation cases, for claims. You don't dispute that? No, I mean, clearly she's a public figure. Okay. And it seems to me they also have to show malice on the tortious interference. You would also have to show malice on that too. I don't think they word it as malice, I think it's improper interference, but I think it's probably at the end of the day the same analogy. Same kind of thing? Yeah, same kind of thing. Okay. Because you can legitimately complain about an officer who you think is not doing the job to their supervisor and say they should be fired. There's nothing actionable about that. It's got to be with some kind of improper motive, yeah, with malice here. And what's hard in the case is there is some conduct that's undisputed by the officer that ultimately the employer found was grounds for a fine, right? I know you're challenged. I don't know what she did wrong, and I'm hoping that brother counsel will explain it because it's not explained in any of the paperwork. What rule did she violate? She considered using a rule in her interview. Well, I don't know that it has to be used to be a violation of standards of professional standards. I don't know if there has to be some rule she violated. I think it was she was using a ruse. She suggested using a ruse to have somebody arrested with some racial overtones over it, not for racial purposes. It's not legitimate if you do it for racial purposes and it had a racial overtone. Why is it legitimate to use that? We use sexual-based... I don't think I'd go with if the statement was okay, what she asked them to do. Lawyers don't honor sexually harassed people all the time. They solicit johns and prostitutes. What happens if the person doesn't... I'm not going to debate it with you, but she said go to this white man and do a pretentious traffic stop so we can get his thumbprint. They could have just pulled the guy over and said, give me your ID. But that's not what happened, and that's not what she suggested. So anyway, going back to the tortious interference of the business relationship, you agree you have to show some ill intent with regard to that, too, to get her fired. Yes, ma'am. They explicitly... Okay, so tell me both the malice and the ill intent, because I think this is whether it Okay, so what is your best evidence of ill intent, since there was something that even her employer found was sufficient to fire her for? Because they weren't limited to just raising... Let's say they had a legitimate concern about that comment, which none of the individual defendants... I think you better assume for sake of argument they had a legitimate concern about what she was proposing. Okay. You're not going to concede that, that they had a legitimate concern about what she was  No, ma'am. Okay. I think we have expert testimony from a law enforcement official saying that that's perfectly acceptable. So, I mean, it's used, and that was actually a good idea. So I think, you know, are these the judge's personal opinions on that, or is that... What are we doing? What are we basing this on? Because I think you have... And if it's caused law, why shouldn't the jury decide that? But I think you have here the open intent, the openly admitted intent of what these multiple complaints... Not just one complaint, which there is no complaint... Let's assume for sake of argument, their intent was to get a five. They thought she was trying to set him up for the treehouse murders. We got that. Okay. And part of how she was trying to do it was to do this ruse to start investigating it. Okay. So, what else besides the ruse did they do besides all their speech? There is the multiple emails that Ms. Higgins sent to Mr. McCullough. There is the submitting the confidential memo to the news media. There is the Facebook post saying that you want this person to lose their job. There is the jailhouse phone calls where Mr. Tucker and Ms. Jani are developing a plan called Create Project Mayhem, which the intent is not to come to the truth, but to discredit and harm the individuals involved. So they... Besides all that speech, the emails and the memos, they're saying she needs to be fired. What conduct did they have besides writing all that or saying all that? Well, I haven't seen any assault or anything. I don't think... There's no... Did they frame her on something else? Did they say she had done something? I know they complained about this. There's one example. There was an investigation that was started because of a complaint filed by Ms. Higgins slash Tucker about the number of individuals because there was too many police officers in the courtroom one day, which was not Ms. Phelps's fault. I mean, what they had done is that somebody at the state's attorney's office had told certain individuals that... You're over your time and you've answered my questions. Thank you. Okay. Good morning. May it please the court, my name is Brian Koji. I'm the attorney here on behalf of Sheriff Rick Ramsey, counsel for the individual defendants. We're dividing our time. Some focus this morning on the arguments relating to the employment claims Ms. Phelps has brought against the sheriff's office. The issue here is whether or not Sheriff Ramsey can properly dismiss Captain Penny Phelps from her public facing role as a command officer because she directed a subordinate to go act like a neo-Nazi white supremacist to the point that that individual, a black male, would come back and file a complaint against the sheriff's office as part of this traffic stop ruse. Now, we are not contending here and never have throughout this case that it's improper for the sheriff's deputy or for Captain Phelps to order a lawful traffic stop as part of a ruse to get a subject's identity. What we have said all along is it's improper to inject these racial overtones into this potential, this ruse, whether it's used or not. Now, unbeknownst to Captain Phelps, that was inadvertently recorded and subsequently, as to the individual defendants, and then released publicly once it came to the sheriff's office attention. Would you characterize the traffic stop, I know it had the racial overtones, but was it to be a fake traffic stop for something he really didn't do or just kind of a pretextual traffic stop? It was not to be a fake traffic stop for something he didn't do. Okay. It was to be a lawful traffic stop. So, he's riding a bike. If he fails to stop at a stop light. So, they were looking for him to do something illegal in the thing. Okay. So, it's the racial overtones that was the problem. Okay. Yeah, and the racial overtones not been part of it and they stopped him for a lawful reason, we wouldn't be here today, Your Honors. Okay. One thing that can't go without being said is the position of Captain Phelps. She is one of the highest ranking individuals in the sheriff's office. She is in a public facing role. She is essentially one of the liaisons that Sheriff Ramsey uses whenever he wants to make public statements and things of that nature. So, once this statement came out to the attention, not only the sheriff's office, but came out to the public, the fallout from that was wide reaching and completely damaging to the sheriff's office. This garnered local press, state press, national press, international press. It was carried on a New York Times, all around the world about Sheriff Ramsey's office and a captain making a statement directing subordinates to act like neo-Nazis. That's what we're talking about here. There is certainly legitimate grounds for the sheriff to not only investigate, but to subsequently discharge Captain Phelps for that conduct. Can I ask you a question about Phelps' claim against Ramsey and Higgins alleging violations of Florida's Law Enforcement Officers' Bill of Rights? The district court had dismissed that, but there's a Supreme Court case, D'Agostino v. City of Miami, where the Florida Supreme Court has recognized that section 112.532.3 gives an officer the ability to bring a civil suit for damages against individuals like Ramsey and Higgins. How do you reconcile that with the district court's ruling? Certainly, Your Honor. That Florida Supreme Court case, a recent case, came up in the context of whether or not the Law Enforcement Officers' Bill of Rights, the state law, preempts the City of Miami from being able to subpoena officers. They found that the state statute preempted, it did not involve a case where damages was an issue. That was not the issue in the case. Now, it did quote the statute there. It went through at great length what was included in the Law Enforcement Officers' Bill of Rights, and it quoted that. But it quoted that subsection 112.532.3 that says you can bring a civil action for damages, and it says specifically, damages for violation of the officer's civil rights arising out of the officer's performance of official duties or filing a complaint against the officer which the person knew was false, which is not what we have here. It goes on to say, and I think this is the critical part, Your Honor, this section does not establish a separate civil action against the officers employing law enforcement agency for the investigation and processing of a complaint under this part. That's what we have here in this case. He's trying to sue Sheriff Ramsey because of alleged improprieties in the investigation, violations of the Law Enforcement Officers' Bill of Rights, and that very section that they point to says you can't do that, and D'Agostino does not say anything contrary to that. In fact, previously in the Migliori case in the early 80s, they held that you couldn't have a cause of action against your employing agency, and of course, the Supreme Court adopted that decision in total. So, you're not saying that there's not a cause of action for damages. You're saying that this situation is specifically exempted by the statute. Is that your argument? Yes, certainly on Sheriff Ramsey's argument is that you could have a cause of action for damages for violating civil rights, filing a false complaint, not against your employing agency or not outside of that context. I would also add that subsection 112.534, also part of the Bill of Rights, has an elaborate administrative procedure if you think your employing agency is violating the Florida Police Officers' Bill of Rights. There are procedures in place to remedy that, and action for damage against the Sheriff's Office is not one of them. Turning again to the discrimination complaint, we think the district court's order granting summary judgment in Sheriff Ramsey's behalf should be affirmed by this court. He didn't really argue his employment claims. He focused on defamation and the business interference. The only verbal defamation claim against Sheriff Ramsey, which was dismissed on the motion to dismiss, it was dismissed on the basis of Florida state law, the doctrine of absolute immunity. Right, so most of them are against the other individuals. Okay, so go on with the employment since that's what you've got to defend against. Your Honor, let me simply remind the court that the fallout here is far and wide. We had local agencies, the local college, the College of Florida Keys, barred Captain Phelps from teaching, which he had long-standing been a teacher, an adjunct teacher there. The local leadership, the community leaders in an association known as Leadership Monroe County, immediately canceled her public events, did not want her to speak on behalf of the Sheriff's Office. This is the fallout that the Sheriff was dealing with. There had been nothing raised throughout this case which indicates that the Sheriff's reasoning for letting her go because of these inflammatory racial statements was pretextual. And even to this day, apparently, Captain Phelps doesn't understand what she did wrong. Would the Sheriff's Office have been justified in what it did, even if it normally would have allowed that behavior? But the fact that it got all this publicity, was that a sufficient justification? I think they're essentially interrelated. If the Sheriff's Office allowed racial overtones but decided we were only going to do it because there was a media outcry, I mean, obviously, the Sheriff Ramsey would never allow this sort of thing. But that would still be a legitimate reason if that were the set of facts because it has nothing to do with her gender or her sexual orientation. This is somebody who is openly gay female for 17, 18 years that she knew Sheriff Ramsey and what he did was champion her career all the way up until this event. He had no animus against her and in that scenario, which is a hypothetical, I don't think that's the case here, it would still not be discriminatory because it has nothing to do with her gender or her sexual orientation. Thank you. Thank you, Your Honor. Good morning, Your Honor. May it please the Court. My name is Mark Cadanzaro. I represent the individual defendants. And I'll address, since defamation was the most significant argument made by Ms. Phelps, I'll deal with that first. Plaintiff suggests that these statements are false. Plaintiff suggests that they aren't statements of opinion. Plaintiff never addresses, or when they address it, they skirt over the fact she's a public figure. They have to show actual malice. Actual malice is not ill will. Whether or not they had ill will toward Ms. Phelps is not the standard. The standard is did they make false statements or statements that they knew had a high probability of being false. Now, when we sit here, I'd like to first deal with Ms. Gennai because I think that's the fastest way. Ms. Gennai never mentioned Tammy Phelps. We've referenced it in our brief. Ms. Gennai indicated that the Key West Police Department and the Monroe County Sheriff's Office and the Monroe County State's Attorney's Office was corrupt and that they'd been picking on poor people. The name Phelps never came up from Gennai. The name Captain never came up from Gennai. Never said a word about her. There's not a quote you can find anywhere in the record where she even implied that Penny Phelps did anything significant in this particular case. We then get to their position that they're false or that the plaintiffs had, or defendants had reason to believe that they were false. And so we, it's also a subjective standard. The subjective standard as to actual malice, that they know they were false or that they harbor a belief that they were false. But we'll just- But what about Higgins' statement where he said that she created a story in her mind and manufactured evidence to fit her narrative? Why isn't that knowingly false? If we look at the plaintiffs' or defendants' brief at pages 7 to 10, have that been spigot, but I'll summarize them for you. Ms. Phelps made the racist comments. Ms. Phelps, when a confidential informant indicated that Mr. Tucker went to an MCS store with Rory Wilson, who was Detroit. So Ms. Phelps said, Tucker went to the MCS store with Detroit. So that is the white guy, that is our white guy. They indicated Tucker, the white guy, Mr. Tucker, did not match the description provided by the eyewitness. Ms. Phelps told her subordinates to show Mr. O'Quinn, who was an eyewitness, he was someone on the scene, show Mr. O'Quinn a lineup with Tucker in it. And her response, I quote, I hope Todd, Todd O'Quinn, can ID him, otherwise, Jesus Christ, we are all in trouble. O'Quinn told them Tucker was not involved. The lead detective, Pitcher, did not believe they had probable cause to arrest Tucker. The lead detective believed Phelps told Detroit's girlfriend what to say. Detective DiGiovanni believed that Phelps, when she was interviewing that woman, what she did to her was improper. From the tape of the interview of Wilson, in a three-minute period, she told Wilson Tucker was involved eight separate times. Wilson said to her, if I say that Tucker did it, I'd go home. The living victim, Paula Belmonte, said she knew Tucker and it wasn't Tucker. There's three minutes of the interview with Rory Wilson. She sits there and says, we know Tucker's involved, we know Tucker's involved, we know Tucker's involved. He says, can I, if I say Tucker did it, can I go home? There's a three-minute gap in the tape. And then Rory Wilson says Tucker was involved. Those are the facts that Higgins, Gennai, and Tucker knew at the time they were making these statements. So when Higgins, Gennai, and Tucker are saying, when you're asking if they believed, because remember, we come back to it's a subjective intent. Did Tucker, Higgins, and Gennai believe that Phelps did everything she could to manufacture a case against Tyrone Tucker? Those are some of the facts. The brief lays out the specific references to where those can be found. What about the fact that the statement that Phelps made that was recorded referenced finding a legal way to stop him on the bike, but then we have Tucker having two statements that it was a racist cop trying to illegally pull over Rory on the bike, and there's another reference to an illegal stop when she, in fact, had talked about doing a legal stop. How do you... Well, when you talk about what he believes, remember the stop wasn't made. She's telling him to do something in Futuro which hasn't happened. And she's saying you need to do this, and she is adamant, we need to make this happen. And so Tucker, in Tucker's mind, he's sitting there and in his thought, because again we look at subjective, she was committed and was adamant that Deputy Malone needed to make that stop. Now, if fortunately he ran a stop sign or he jaywalked or he did something, then it would be fine. But in Tucker's view, when Tucker listened to the totality of the facts, he basically is understanding her to say, you get a stop, I need his fingerprint. The Monroe County Sheriff's Office have said I need his thumbprint. But isn't it, I mean, she has said make a legal stop, it hasn't happened, and then he on Facebook is saying she wanted to make an illegal stop. How is that not false? What Mr. Tucker is saying on Facebook twice. How is it not, I'm sorry? How is it not false? Well, whether it's false, the question is, is it actual malice? Or you're asking if it's false. What he's saying is that in his mind, he doesn't think it's false. He believes that she sat there and tried to push down Rory Wilson's throat, that Tyrone Tucker was with you and committed this crime. So this is not, you can't look, we can't look at, in an abstract, what Tucker's thought process is. She sat there and said, and he knows from the discovery, she sat there and said, this is our white guy. If Todd O'Quinn doesn't identify him, we're all in trouble. This is the panoply of evidence that Tucker has when he's making these statements. To sit there and just because Ms. Phelps said make a legal stop, he's sitting there in his mind watching everything she did throughout the course of this investigation, making sure he was going to be the person that got charged and she was going to find a way to do it no matter what. And so I suggest when we talk about what Tucker thought and whether he subjectively believed the statements to be false, I suggest not. It never happened. Had, perhaps we're in a different situation, if Lee Malone indicated that he went, ran through a stop sign or he did a jaywalk, but that's not what happened, that's not where we got there. I see that my time's up. Can I ask you a question? Is Mr. Tucker's on trial, on a second trial, right? Is there a second jury trial going on for Mr. Tucker? I'm sorry? Mr. Tucker's on trial. Is he the one on trial for the murder? Yes. And is there a verdict there yet? It was the first trial was a missed trial, right? Yes. And there's a second trial. Has not happened yet. It hadn't started. No, the trial judge of the first trial refused himself and they transferred the case to Marathon and that trial has not occurred. It hasn't occurred yet. Okay. So has anybody been convicted of the Treehouse murder? He is not. It's only, Rory Wilson's been convicted of the Treehouse murders. Mr. Johnson. Is Mr. Wilson the one they were trying to stop in the bike? Yes. Wilson is the one that is the blackmail. That they were trying to stop on the bike. Mr. Troy. He confessed. Okay. So Wilson was, he confessed. Okay. Thank you. I'm just trying to put all the people together as to what was going on. The third person entered a guilty plea to a lesser offense and testified as a cooperator against Mr. Wilson. Okay. And Mr. Tucker in the first trial. Okay. Thank you. I just being, I wanted to just say first, most of the stuff that, most of the facts that Mr. Tucker is allegedly basing his opinion on is based on inadmissible hearsay. And so I think that should be mindful of that. But the point here is, right, because I think this ties into the employment case, right, it's, what were they trying to do there? They weren't just trying to ID Mr. Wilson. They're trying to ID him without alerting him to the fact that he was a suspect for a murder. If they just wanted his fingerprint, they could have done a Terry stop and asked for his ID and ID'd him. Right? But they wouldn't have had a basis to retain him. So he could have fleed. He could have acted violently. He couldn't have done that. Right? So they need to come up with a reason that would allow them to stop him without alerting him to the fact. Hence, the ruse. Now, you want to talk about what was the legitimate reason? Well, it wasn't that you used the racially charged thing because the sheriff knew about that before there was any of this press coverage. And the sheriff didn't tell Ms. Phelps, you're going to be fired because of that. He said, we hope to clear your name with full knowledge of what was said on that tape. So it wasn't because of a racially charged thing. It was because of the news media. Who caused that news media? Higgins, Janai, Tucker. And the sheriff's department by illegally releasing a confidential memo. Okay, so why did they do that? Because did they want to get rid of somebody? Did they want a scapegoat? Absolutely, they did. And they picked Ms. Phelps. And you want to talk about what other evidence is there? Okay, this comparative. Sergeant, where is? Every single command officer is publicly facing. Every single command officer has obligations to the public. They participate in community events. They supervise individuals. Sergeant, where is? Racially profiled two Latino individuals. The first one was hit by a vehicle on a bike. It was on the side of the road laying down. And the first thing he did was not to ask, hey, are you okay? Do you need help? It was to ask, are you legal? Okay, now that had outrage. That was national media. That was local groups saying, we don't want a part of this. You have to stop this. What was the response? Sheriff Ramsey said, I don't have a problem with what he did. There was no investigation. There was nothing. He told the media, I don't have a problem with it. What did he do in Ms. Phelps' situation? He said, listen, if I get a complaint like this, it's going to IA. I'm making sure this is investigated and whatnot. You have a different treatment through and through on this. And now they want to say, well, hey, there's a difference in rank. Okay, but there should be some factual testimony. Why did the sheriff treat it like this? There was a big difference in rank. Not some difference, a big difference. Again, I think there's a debate on that. But when you say, well, why does it matter? What does it matter? And is it the argument of the attorney as to why it matters? Is it the argument of the district court judge? No. What did the sheriff say? I can't tell you why I was treated differently. He didn't cite the difference in rank. So, I mean, if argument of counsel is not evidence, there's no evidentiary basis as to why they treated him differently. And so, in the absence of that, can a juror conclude that, hmm, maybe it was because she was a woman? When you have the sheriff referring to all of the officers, these high-ranking public-facing officers, as missed? And, I mean, I mean no offense, but if I would refer to one of your honors as missed and repeatedly did that, knowing that the standard, what is due to your office, the respect due to your office. Didn't the sheriff say that he also referred to male officers as sir? That's not what he said. Ms. Phelps complained about it. She complained about it to Patrick McCullough. And we'll talk to him about it. They didn't conduct an investigation. They didn't send it to IA like it should have been. Right? So, is the sheriff above the law? He does that. He refers to everyone as a lawman. Completely erasing the whole female gender in the employment. And that's important because you look at historically, people used to say, and some people still say, women don't have a place in law enforcement. Okay, so is that a carryover from those bygone days, which, you know, really aren't that long ago? Did she work there 16 years? She did. And he promoted her, the sheriff promoted her all along, way up? She was hired as a captain. She left as a captain. Uh-huh. Did she do her assignments over the years? Sure. What was she in charge of when she left? I don't know if she was in charge of anything. She had all of her assignments removed, I believe, at the end. But before that happened, she was over major crimes, narcotics. She had 200 people or something under her. Sure. No, not derived reports, but overall in those divisions. Yes. And he placed her into that position as being the head of major crimes, which is a fairly significant position. It is, but I think also you have to agree with the streams of politicians. And so, while not meeting publicly, he doesn't have a problem with LGBT individuals or women and stuff. You have to remember, he met with Ms. Phelps in his office and berated her for even thinking that he might be gay or that having a conversation with other individuals that asked him about whether he was gay. And he had an incredibly odd reaction to that and yelled at her about that. And so, you know, is he doing things when it suits his purpose? Absolutely. And that's why he didn't have a problem with this comment when it first came out. It was only after it got into the news. And that's what goes to their motivation. Are they truly motivated by some legitimate reason, or is it something else? Because it wasn't what she said on the recording because he told her, I hope that you're right. Okay, I want to go back to your complaint. And I didn't think you cited 1-1-2-5-3-2-3 in your complaint. Is that correct? To be honest, I don't know. You don't know? I think it's a couple of pages or something. I don't have it remembered. Okay. There's nothing for a very long time. Thank you. Thank you. Next on the calendar is